**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 24, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENCH CIRCUIT

THE SCO GROUP, INC.,

Plaintiff-Appellant,

v.

No. 08-4217

NOVELL, INC.,

Defendant-Appellee.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:04-CV-00139-DAK)**

---

Stuart Singer, Boies, Schiller & Flexner LLP, Fort Lauderdale, Florida (David Boies, Robert Silver, and Edward Normand, Boies Schiller & Flexner LLP, Armonk, New York; Brent O. Hatch, Mark F. James, Hatch, James & Dodge, PC, Salt Lake City, Utah; Devan V. Padmanabhan, Dorsey & Whitney LLP, Minneapolis, Minnesota with him on the briefs) for Plaintiff-Appellant.

Michael Jacobs, Morrison & Foerster LLP, San Francisco, California (George C. Harris, Grant L. Kim, David E. Melaugh, Morrison & Foerster LLP, San Francisco, California; Thomas R. Karrenberg, Heather M. Sneddon, Anderson & Karrenberg, Salt Lake City, Utah with him on the briefs) for Defendant-Appellee.

---

Before **LUCERO**, **BALDOCK** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

This case primarily involves a dispute between SCO and Novell regarding the scope of intellectual property in certain UNIX and UnixWare technology and other rights retained by Novell following the sale of part of its UNIX business to Santa Cruz, a predecessor corporate entity to SCO, in the mid-1990s. Following competing motions for summary judgment, the district court issued a detailed opinion granting summary judgment to Novell on many of the key issues. We affirm the judgment of the district court in part, reverse in part, and remand for trial on the remaining issues.

## I. Background

We begin by laying out some of the basic facts underlying Novell's transfer of certain UNIX-related assets to Santa Cruz, as well as the background to the instant litigation. Other facts will be discussed as the issues require.[1]

### A. The UNIX Business and the Sale to Santa Cruz

UNIX is a computer operating system originally developed in the late 1960s at AT&T. By the 1980s, AT&T had developed UNIX System V ("SVRX"); it built a substantial business by licensing UNIX source code to a number of major computer manufacturers, including IBM, Sun, and Hewlett-Packard. These manufacturers, in turn, would use the SVRX source code to develop their own individualized UNIX-derived "flavors" for use on their computer systems.

---

[1] The motion of Wayne R. Gray, for leave to file a brief as amicus curiae, is denied.

Licensees could modify the source code and create derivative products mostly for internal use, but agreed to keep the UNIX source code confidential.

In 1993, Novell paid over $300 million to purchase UNIX System Laboratories, the AT&T spin-off that owned the UNIX copyrights and licenses. Only two years later, however, Novell decided to sell its UNIX business. Although Novell may have initially intended "to sell the complete UNIX business," both parties agree that Santa Cruz was either unwilling or unable to commit sufficient financial resources to purchase the entire UNIX business outright. App'x 8610; Aplt. Br. 8; Aple. Br. 5. The deal was therefore structured so that Novell would retain a 95% interest in SVRX license royalties, which had totaled $50 million in 1995.

The transfer of Unix-related rights occurred pursuant to three documents: an asset purchase agreement ("APA") executed on September 19, 1995; "Amendment No. 1" signed by the parties at the actual closing on December 6, 1995; and "Amendment No. 2" on October 16, 1996. The APA provided that:

> "Buyer will purchase and acquire from Seller on the Closing Date . . . all of Seller's right, title, and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets") identified on Schedule 1.1(a). Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b).

Schedule 1.1(a) included within the list of "Assets" transferred, "[a]ll rights and ownership of UNIX and UnixWare." App'x 313. Section V of the Asset

Schedule, entitled "Intellectual property" provided that Santa Cruz would obtain "[t]rademarks UNIX and UnixWare as and to the extent held by Seller" but did not explicitly mention copyrights. App'x 315. In contrast, Schedule 1.1(b), the list of assets excluded from the deal, did expressly speak to copyrights. Section V—"Intellectual Property"—explained that "*All copyrights* and trademarks, except for the trademarks UNIX and UnixWare," as well as "[a]ll [p]atents," were excluded from the deal. App'x 318 (emphasis added).

Less than a year after the deal closed, the parties agreed to Amendment No. 2, which amended the APA's treatment of copyrights. Amendment No. 2 provided that:

> With respect to Schedule 1.1(b) of the Agreement, titled 'Excluded Assets', Section V, Subsection A shall be revised to read:
>
> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. However, in no event shall Novell be liable to SCO for any claim brought by any third party pertaining to said copyrights and trademarks.

App'x 374.

The APA separately purported to give Novell certain residual control over "SVRX Licenses." Section 4.16(b) of the agreement provided that:

> Buyer shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior written consent of Seller. In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any

-4-

rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller.

The parties differ markedly in their characterization of the rights transferred to Santa Cruz and the value of the deal. According to SCO, Santa Cruz purchased the bulk of the business, including the core UNIX copyrights, for $250 million, but Novell retained a 95% interest in royalties as a "financing device." According to Novell, SCO's $250 million figure improperly inflates the value of the deal, by accounting not only for the value of assets actually transferred by SCO to Novell, but including the share of the SVRX royalty stream *retained* by Novell. *See* Aple. Br. 5 n1. Novell calculates that it received only about $50 million in stock, as well as a promised share of the "UnixWare" revenue stream exceeding certain targets. Novell contends that it retained ownership of the UNIX copyrights, extending only an implied license to Santa Cruz to use the copyrights, for instance, to develop and distribute an improved version of Novell's "UnixWare" product.

In support of its understanding of the transaction, SCO relies heavily on extrinsic evidence of the parties' intent at the time of the APA—including testimony from *Novell's* leadership at the time—suggesting that the parties' intent was to transfer the copyrights. For instance, Robert Frankenberg, then President and CEO of Novell, testified that it was his "initial intent," his "intent at the time when the APA was signed," and his "intent when that transaction closed" that

"Novell would transfer the copyrights to UNIX and UnixWare technology to Santa Cruz" and that "that intent never changed." App'x 8563. Similarly, Ed Chatlos, a Senior Director for UNIX Strategic Partnerships and Business Development within Novell's Strategic Relations and Mergers and Acquisitions organization, submitted an affidavit affirming SCO's version of the facts. *See* App'x 8659–60:

> In or about June 1995, I became the lead negotiator for Novell in the negotiations with SCO and headed the day-to-day responsibility for the potential deal. . . . During these negotiations, I met regularly with SCO representatives. . . . Early in our discussions, it became apparent that SCO could not pay the full purchase price as contemplated by Novell. To bridge the price gap, it was ultimately agreed that Novell would retain certain binary royalty payments under UNIX licenses. It was my understanding and intent, on behalf of Novell—that the complete UNIX business would be transferred to SCO.

Novell, in contrast, defends its interpretation of the transaction largely by pointing to the language of the contract itself, and by arguing that the witnesses put forward by SCO to offer extrinsic evidence of the parties' intent lacked any familiarity with the actual drafting of the APA's language or Amendment No. 2. *See* Aple. Br. 6–10. At oral argument, Novell suggested that whatever the intent of the business negotiators involved in the deal, it was superseded by the work of those lawyers who ultimately negotiated the language of the contract that governs the transaction.

## B. Proceedings Below

In May 2001, Santa Cruz sold its UNIX business to Caldera, the immediate predecessor to SCO. Santa Cruz purported to transfer its interest in the UNIX and UnixWare copyrights to Caldera / SCO. In 2002 and 2003, tensions increased between Novell and SCO. SCO asserted that users of Linux, an alternative to UNIX, might be infringing on SCO's UNIX-related intellectual property rights. *See* App'x 7178. It purported to offer Linux users the opportunity to purchase an intellectual property license in order to continue using Linux without infringing any of SCO's copyrights. *See id.*; Aple. Br. 13. In March 2003, SCO brought contract and copyright claims against IBM on the basis of SCO's alleged intellectual property rights in UNIX. Novell then directed SCO "to waive any purported right SCO may claim to terminate [certain of] IBM's SVRX Licenses," on the basis of its aforementioned waiver rights, set out in Section 4.16 of the APA. After SCO refused, Novell ultimately claimed publicly that it—rather than SCO—maintained ownership over the UNIX copyrights. App'x 5875.

SCO filed a slander of title action against Novell. Novell asserted counterclaims for slander of title, breach of contract, and unjust enrichment. Both parties then proceeded to amend their pleadings to add additional claims and counterclaims. After the parties filed dueling motions for summary judgment, the United States District Court for the District of Utah issued a detailed memorandum decision and order on August 10, 2007.

-7-

The district court first concluded that Novell is the owner of the UNIX and UnixWare copyrights. It reviewed the APA and Amendment No. 2 separately and sequentially. *See* Dist. Ct. Op. 45–46. The court found that the plain language of the APA indicated that the UNIX copyrights were not transferred to Santa Cruz. *See* Dist. Ct. Op. 52. The court also determined that Amendment No. 2 did not transfer ownership of the copyrights. *See id.* at 59. It reasoned that "[u]nlike the APA, Amendment No. 2 was not accompanied by a separate 'Bill of Sale' transferring any assets." *Id.* In addition, it found persuasive that Amendment No. 2 amended only the list of excluded assets from the transaction (Schedule 1.1(b)), but did not alter the language of the list of included assets (Schedule 1.1(a)). Finally, the court determined that Amendment No. 2 did not sufficiently identify which copyrights were to change hands, and therefore failed to satisfy the requirements necessary to transfer ownership of a copyright under Section 204(a) of the Copyright Act, 17 U.S.C. § 204(a).

Having found that SCO's assertions of copyright ownership were false, the court granted summary judgment to Novell on SCO's claims alleging slander of title and seeking specific performance of Novell's alleged duty to transfer ownership of the UNIX and UnixWare copyrights to SCO. *See* Dist. Ct. Op. 62. The court also rejected SCO's claims against Novell for unfair competition under Utah common law or statutory law, or for breach of the implied covenant of good faith under California law. *See id.* at 63.

Next, the court reviewed the parties' competing cross motions regarding whether the APA authorized Novell to direct SCO to waive its claims against IBM and Sequent (which had been acquired by IBM in 1999) for alleged breach of their SVRX license agreements. The parties disputed both whether the IBM and Sequent Sublicensing Agreements were "SVRX Licenses" within the meaning of the APA, as well as the scope of provisions in the APA purportedly authorizing Novell to take action on SCO's behalf after SCO refused to waive the claims. *See id.* at 76. Although the district court agreed with SCO that "there appears to be some ambiguity in the APA's attempt to define SVRX Licenses," *id.* at 78, it ultimately found "no support in the language and structure of the APA for SCO's interpretation of SVRX License[s]." *Id.* at 86. It therefore concluded that "SVRX Licenses" referred to the "entire set of agreements relating to the licensing of SVRX code." *Id.* As a result, the court found that Novell "was and is entitled, at its sole discretion, to direct SCO to waive its purported claims against IBM and Sequent, and [that] SCO is obligated to recognize Novell's waiver." *Id.* at 88. Having determined that SCO gave Novell the right to waive SCO's claims by virtue of "an explicit grant of contractual authority," the court also concluded that California law precluded the application of the covenant of good faith and fair dealing. *Id.* at 87.

Finally, the court addressed Novell's entitlement to royalties from certain licensing agreements entered into between SCO and Sun and Microsoft in 2003.

The court found that SCO's duty to turn over revenue from SVRX licenses was not limited only to licenses existing at the time of the APA. *See id.* at 93. It also concluded that the Sun agreement represented an unauthorized amendment to an SVRX License, in violation of Section 4.16(b) of the APA. As a result, it concluded that "SCO breached its fiduciary duties to Novell by failing to account for and remit the appropriate SVRX Royalty payments to Novell for the SVRX portions of the 2003 Sun and Microsoft Agreements." *Id.* at 96. After a later bench trial on the value of payments due to Novell, the district court awarded Novell judgment in the amount of $2,547,817. Findings of Fact, July 16, 2008 at 42.[2]

On appeal, SCO challenges various aspects of the decision below. It argues that the district court erred by concluding, *as a matter of law*, that (1) Santa Cruz did not obtain the UNIX and UnixWare copyrights from Novell, but instead acquired only an implied license; (2) SCO was not now entitled to specific performance—the transfer of any copyrights not transferred by the APA; (3) Novell has the right under the APA to force SCO to waive legal claims against IBM for its alleged breach of software and sublicensing agreements; (4) Novell did not have to comply with the implied covenant of good faith and fair dealing in

---

[2]The district court also issued a number of rulings regarding specific arguments made in support of both parties' claims and counterclaims. To the extent that those rulings do not directly affect the substance of this appeal, we do not address them.

exercising any waiver rights; (5) Novell retained an interest in royalties from SCO's 2003 agreement with Sun Microsystems and other post-APA contracts related to SVRX technology. We address each argument in turn.

## II. The Ownership of UNIX and UnixWare Copyrights

We begin by reviewing the district court's decision to grant summary judgment to Novell with regard to SCO's claims of ownership in the UNIX and UnixWare copyrights. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1182 (10th Cir. 2003) (citation omitted). We review the district court's grant of summary judgment de novo. *Id.*

SCO argues that the district court erred by interpreting the APA and Amendment No. 2 as separate and independent. It further contends that the text of the APA and Amendment No. 2 is at least ambiguous concerning whether the parties intended to transfer ownership of the copyrights, making it appropriate to consider extrinsic evidence. SCO asserts that a thorough review of extrinsic evidence makes summary judgment inappropriate on whether the copyrights were transferred by the transaction. Finally, SCO argues that the language in the APA

-11-

and Amendment No. 2 was sufficient to meet the requirements to transfer ownership of a copyright under the Section 204(a) of the Copyright Act.

Novell, in contrast, argues that we ought to consider the APA and Amendment No. 2 separately. It asserts that the plain language of the APA itself unambiguously did not transfer copyright ownership, making consideration of parol evidence inappropriate. As for Amendment No. 2, Novell contends that no admissible extrinsic evidence shows that it was intended to transfer copyright ownership. Additionally, Novell claims that "SCO presented no evidence that copyright ownership was *required* to exercise its APA rights." Aple. Br. 33 (emphasis added). Because Amendment No. 2 revised the excluded assets schedule so as to allow only for transfer of those "copyrights . . . owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies," Novell argues that SCO has failed to demonstrate that any copyrights were transferred. Finally, Novell argues that any purported transfer of copyrights did not meet the requirements for transfer of ownership under the Copyright Act.

We will proceed in three steps, asking first, whether the APA and Amendment No. 2 should be considered separately or together; second, whether the APA and Amendment No. 2 satisfy any requirements imposed by the Copyright Act in order to effect a transfer of copyright ownership; and third,

-12-

whether the district court erred by concluding, as a matter of law, that the transaction's language and any admissible extrinsic evidence could not support the conclusion that Novell and Santa Cruz intended the copyrights to transfer.

**A. Should We Consider APA and Amendment No. 2 Separately or Together?**

The parties initially contest whether Amendment No. 2 should be read separately from the APA or together with it, as a successive writing elucidating the parties' intent in the original document. As we explain below, our disposition on this point is important primarily because it operates to fix the scope of extrinsic evidence admissible to clarify the contract.

California law "generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument." *Gerdlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263, 270 (Cal. Ct. App. 1987). California's parol evidence rule provides that "[t]erms set forth in a writing intended by the parties as a final expression of their agreement . . . may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Cal. Code Civ. Proc. § 1856(a). Such a writing "may not be contradicted by even the most persuasive evidence of collateral agreements. Such evidence is legally irrelevant." *EPA Real Estate P'ship v. Kang*, 12 Cal. App. 4th 171, 175 (Cal. Ct. App. 1992); *see also Gerdlund*, 190 Cal. App. 3d at 270 (Cal. Ct. App. 1987) (although all parties testified that they shared same intent as to employment agreement, evidence was not admissible to prove meaning of

-13-

contract where plain language of contract could not support that interpretation). The rule "is based upon the premise that the written instrument *is* the agreement of the parties." *Id.* (citing *Tahoe Nat'l Bank v. Phillips*, 480 P.2d 320, 4 Cal.3d 11, 22–23 (Cal. 1971)).

On the other hand, "[e]ven if a contract appears unambiguous on its face, California law permits the use of extrinsic evidence to expose "a latent ambiguity . . . which reveals more than one possible meaning to which the *language* of the contract is yet reasonably susceptible." *Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (Cal. 2006) (emphasis added). "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Id.* (quoting *Pacific Gas & E. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968)). Thus, California law does not permit the use of extrinsic evidence to establish an ambiguity in the parties' intent independent from the terms of the contract; instead, it can only be used to expose or resolve a latent ambiguity in the language of the agreement itself.

If we were to interpret the contract based initially only on the APA itself—without regard to Amendment No. 2—we agree that its language unambiguously excludes the transfer of copyrights. Although SCO argues that

the asset schedule approves of the transfer of "[a]ll rights and ownership of UNIX and UnixWare" to SCO, this ignores that the APA explicitly provides that "Notwithstanding [those assets listed on the Asset Schedule], the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b)." App'x 264–65. Schedule 1.1(b), in turn, explains straightforwardly that "all copyrights" were excluded from the transaction. App'x 318. None of SCO's extrinsic evidence explains how the actual *language* of the APA is "reasonably susceptible" to its interpretation of the transaction—namely, that all relevant copyrights were transferred (or in other words, the exact opposite of what the APA's language suggests). *See* Dist. Ct. Op. 46–51 (explaining why the language of the APA itself cannot bear the interpretation that copyrights transferred to SCO). Novell argues, therefore, that we ought not consider any of SCO's extrinsic evidence bearing on the development of the APA itself, and limit any inquiry beyond the text of the agreement to the course of the parties' negotiations over Amendment No. 2.

But if we understand Amendment No. 2 to clarify the parties' original intent as to the transfer of copyrights, SCO's extrinsic evidence concerning the business negotiations may be relevant to resolving ambiguity concerning the content of that original intent. Indeed, SCO argues that Amendment No. 2 was designed to bring the language of the transaction in line with the parties' original intent to transfer the copyrights. *See* Aplt. R. Br. 10 ("Amendment No. 2

-15-

clarified the APA to confirm that the copyrights had been transferred thereunder.")  Of course, Novell disputes this characterization of Amendment No. 2.  But unlike the language of the APA itself, the contractual language of Amendment No. 2 concerning the transfer of copyrights is ambiguous. Amendment No. 2 revises the excluded asset schedule to limit those copyrights excluded from the transaction to "[a]ll copyrights and trademarks, *except for the copyrights* and trademarks owned by Novell as of the date of the Agreement *required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies*." App'x 374 (emphasis added).  Because what copyrights are "required" for SCO to exercise its rights under the agreement is not clear on its face, California law allows courts to consider extrinsic evidence to resolve the ambiguity.  *See ASP Properties Group v. Fard, Inc.*, 133 Cal. Rptr. 3d 343, 349 (Cal. Ct. App. 2005).  Thus, to the extent that it is proper for us to read Amendment No. 2 as clarifying the APA, SCO's extrinsic evidence of the business negotiators' intent concerning the transaction ought to be admissible.

Having closely considered the parties' arguments, as well as the district court's reasoning, we find that Amendment No. 2 must be considered together with the APA as a unified document.  Under California law, "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."  Cal. Civ. Code § 1642. "[M]ultiple writings must be considered together when part of the same contract."

*Nish Noroian Farms v. Agric. Labor Relations Bd.*, 35 Cal. 3d 726, 735 (Cal. 1984). Even if we considered the language of the APA and Amendment No. 2 to be mutually antagonistic, California law still dictates that we construe them together, following Amendment No. 2 wherever its language contradicts the APA. Where "two contracts are made at different times, [but where] the later is not intended to entirely supersede the first, but only modif[y] it in certain particulars[,] [t]he two are to be construed as parts of one contract, the later superseding the earlier one wherever it is inconsistent therewith." *Hawes v. Lux*, 294 P. 1080, 1081 (Cal. Dist. Ct. App. 1931); *accord San Diego Const. Co. v. Mannix*, 166 P. 325, 326 (Cal. 1917).

In so doing, we note that SCO paid no additional consideration for Novell's agreement to Amendment No. 2. That makes sense if Amendment No. 2 was a clarification of the agreement, to bring the language of the APA into line with the parties' intent. If Amendment No. 2 were a change in the agreement (and a commercially significant one, at that), it is hard to see why Novell would have agreed to it without compensation.

Therefore, we construe the contract and Amendment No. 2 together for the purpose of assessing any ambiguities in the contract. This means that extrinsic evidence regarding the parties' intent is relevant to our interpretation of the combined instrument.

**B. Does the Amended APA Satisfy the Requirements of the Copyright Act?**

We next consider whether the amended APA constituted a writing sufficient to transfer copyrights under federal law. Under the Copyright Act, "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Section 204 is intended "to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses [or transfers]." *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir. 1982). As a result, Section 204 "enhances predictability and certainty of ownership—'Congress's paramount goal' when it revised the [Copyright] Act in 1976." *Konigsberg Intern. Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994) (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989)). Novell argues that the Copyright Act imposes not only the requirement that a copyright transfer be in writing, but also that it state with sufficient clarity the copyrights to be transferred. *See* Aple. Br. 25–26; 34. Novell contends that Amendment No. 2 fails this test because its language is ambiguous. Since it is not clearly apparent which copyrights are "required for Novell to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies," Novell asserts that Amendment No. 2 was not a valid "instrument of conveyance."

As an initial matter, we note that the language of 17 U.S.C. § 204(a) does not readily lend itself to the construction Novell seeks to give it. Section 204(a),

by its terms, imposes only the requirement that a copyright transfer be in writing and signed by the parties from whom the copyright is transferred; it does not on its face impose any heightened burden of clarity or particularity. Likewise, Novell points to nothing in the legislative history of Section 204 which suggests that Congress envisioned it to invalidate copyright transfer agreements carrying material language subject to multiple reasonable interpretations. Nonetheless, some courts have understood Section 204(a) to impose requirements similar to that necessary to satisfy the statute of frauds. They have found that a writing is insufficient to transfer copyrights unless (1) it reasonably identifies the subject matter of the agreement, (2) is sufficient to indicate that the parties have come to an agreement, and (3) states with reasonable certainty the essential terms of the agreement. *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp 933, 936 (N.D. Cal. 1992) (citing Restatement (2d) of Contracts § 131 (1981)).

Novell argues that Section 204's writing requirement would disserve the goals of "predictability and certainty of copyright ownership" if parties could fulfill it without making clear what copyrights they intend to transfer. But it is hardly clear that imposing strict requirements of clarity in order to effect a copyright transfer will always aid "predictability and certainty of copyright ownership." "[A]mbiguities in copyright grants are anything but rare in the jurisprudence." 3 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 10.08 (2009). "The written memorialization of [an] agreement [transferring

copyrights] inevitably fails to mandate only one pellucid interpretation." *Id.* If every copyright transaction were vulnerable to challenge whenever a party is able to point out some ambiguity within the governing agreement, parties might be forced to engage in costly, protracted litigation to determine whether the transfer is valid, putting into doubt the proper holder of the copyright.

In the absence of any support from the language or legislative history, we are unwilling to read into Section 204 such an onerous restraint on the alienability of copyrights. As the Second Circuit has commented, "[t]he need for interpretation of a contract does not necessarily mean that there is a bona fide issue as to whether the contract is a writing for purposes of section 204(a). In most cases, there will be no doubt that the contract is a section 204(a) writing, and the only substantial issue will be contract interpretation." *Jasper v. Bovina Music*, 314 F.3d 42, 47 (2d Cir. 2002). In copyright as elsewhere, "[t]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing." Nimmer on Copyright, § 10.08 (quoting *Tingley Sys. v. Healthlink, Inc.*, 509 F. Supp.2d 1209, 1216 (M.D. Fla. 2007)). Where ambiguity persists in the language of a parties' shared agreement concerning a copyright transfer, the transfer is not invalidated; instead, we look to parol evidence to construe the terms of the agreement. *See* Nimmer on Copyright, § 10.08.

We think that Section 204's writing requirement is best understood as a means of ensuring that parties intend to transfer copyrights themselves, as opposed to other categories of rights. *See, e.g.*, *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1158–59 (S.D.N.Y. 1996) (although a writing need not explicitly mention "copyright" or "exclusive rights" to satisfy 204(a), the better practice is that it should). But when it is clear that the parties contemplated that copyrights transfer, we do not think that a linguistic ambiguity concerning which particular copyrights transferred creates an insuperable barrier invalidating the transaction. Thus, the majority of cases that Novell draws our attention to, in which alleged copyright transfers are found not to satisfy Section 204, involve transactions where it is not clear whether the parties intended that copyrights would transfer at all—not disputes over which specific copyrights were within the scope of an intended transfer. *See, e.g.*, *Radio Television Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 927–28 (9th Cir. 1995) (finding faxes referring to ongoing negotiations insufficient to confirm a finalized deal to transfer copyrights); *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995) (finding check legend allegedly purporting to recognize past "assignment . . . of all rights, title and interest" insufficient to transfer copyrights); *Konigsberg Intern. Inc.*, 16 F.3d at 357 (letter written three and a half years after oral agreement did not constitute a writing sufficient to confirm parties' intent to transfer copyrights in earlier agreement).

Notwithstanding the above, the district court found Amendment No. 2 insufficient to convey Novell's copyrights under Section 204 for several additional reasons. It first determined that Amendment No. 2 "[did] not include any provision that purports to transfer ownership of copyrights." because it did not profess to "amend Schedule 1.1(a)," the Asset Schedule, and because "[u]nlike the APA, Amendment No. 2 was not accompanied by a separate 'Bill of Sale' transferring any assets." Dist. Ct. Op. 59. We are not persuaded that either prevents our recognition of a copyright transfer.

Although Amendment No. 2 did not purport to amend Schedule 1.1(a), this does not mean that the balance of assets transferred to Santa Cruz remained unchanged. The transaction was structured such that Santa Cruz would acquire "all of Seller's right, title and interest in and to the assets . . . identified on Schedule 1.1(a)," but that "the Assets to be so purchased not include those assets (the 'Excluded Assets') set forth on Schedule 1.1(b)." App'x 264–65. Schedule 1.1(a), in turn, provided that Santa Cruz would receive "[*a*]*ll rights and ownership* of UNIX and UnixWare . . . including all source code," a broad set of assets limited only by Schedule 1.1(b). As a result, any change to the set of Excluded Assets in Schedule 1.1(b) necessarily implicated those copyrights actually transferred under Schedule 1.1(a).

Of course, it is not always the case that the absence of certain or all copyrights from an "excluded asset" schedule will suffice to indicate the inclusion

of copyrights in the transaction. But a written asset transfer agreement may satisfy Section 204(a) even when it "does not mention the word 'copyright'" itself. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992). And when a party acquires "[a]ll rights and ownership" in a set of items, as was the case here, courts have generally found such language sufficient to satisfy Section 204(a) in the absence of language excepting copyrights or other special circumstances. *See ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 931 (7th Cir. 2003) (written intent to transfer "all assets" can indicate intent to transfer copyrights); *Chugrue v. Continental Airlines, Inc.*, 977 F. Supp. 280, 284–85 (S.D.N.Y. 1997) (written agreement to transfer "all right, title and interest" in software indicated intent to transfer copyrights); *Relational Design & Technology, Inc. v. Brock*, No. 91-2452-EEO, 1993 WL 191323 at *6 (D. Kan. May 25, 1993) (transfer of "all rights" in software program included copyright). *But see Playboy Enters. v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995) (check legend indicating that payment was for past transfer of "all right, title and interest" was insufficient, by itself, to indicate a copyright transfer under Section 204). Of course, under the language of the original agreement, copyrights were expressly excluded from the assets transferred. But here, where a written agreement to the contract excised certain copyrights from that exclusion, we think the Copyright Act's writing requirement is satisfied.

We also do not see why the absence of a Bill of Sale is fatal to an alleged

transfer under the Copyright Act. Section 204 makes clear that the writing

requirement can be satisfied not only by "an instrument of conveyance" but also

by "a note or memorandum of the transfer." 17 U.S.C. § 204(a). Amendment No.

2 was a writing signed by both parties evincing a clear intent to revise or clarify

the formal schedule of copyrights transferred by Novell to Santa Cruz. The

Copyright Act did not require more. For similar reasons, we reject the

significance that the district court attributed to the fact that Amendment No. 2

revised the APA "[a]s of the 16th day of October, 1996" as opposed to the date of

the Bill of Sale. App'x 374. The Copyright Act does not require its writing

requirement be fulfilled concurrently with the production of a Bill of Sale.[3] *Cf.*

*Eden Toys, Inc.*, 697 F.2d at 36 ("the 'note or memorandum of the transfer' need

not be made at the time when the license is initiated; the requirement is satisfied

---

[3]We think the parties' dispute over whether Amendment No. 2 retroactively changed the APA or affected a clarification as of October 16, 1996 is ultimately much ado about nothing. None of the claims in this litigation depend on the meaning of the APA during the time period prior to Amendment No. 2. Moreover, while both parties attribute different meanings to the APA and Amendment No. 2, neither party argues that Amendment No. 2 was meant to substantively change the intent of the APA; both SCO and Novell agree that it merely clarified or affirmed the original intent of the transaction. *Compare* Aplt. R. Br. 10 ("Amendment No. 2 clarified the APA to confirm that the copyrights had been transferred thereunder.") with Aple. Br. 40 (Amendment No. 2 merely "affirm[ed] that Santa Cruz had a license under the original APA to use Novell's UNIX and UnixWare copyrighted works in its business") (emphasis added).

by the copyright owner's later execution of a writing which confirms the agreement").

We therefore conclude that the APA, as revised by Amendment No. 2, satisfied the Copyright Act's writing requirement.

**C. Is Summary Judgment Appropriate on the Ownership of the Copyrights?**

We come finally to the question of whether the district court was correct to enter summary judgment on the issue of whether Novell or SCO owns the UNIX and UnixWare copyrights under the APA as revised by Amendment No. 2. In contract actions, the interpretation of a written agreement is a question of fact. *See Gomez v. American Elec. Power Service Corp.*, 726 F.2d 649, 651 (10th Cir. 1984). When a contract is ambiguous, and parties present conflicting evidence regarding their intent at the time of the agreement, a genuine issue of material fact exists which cannot be determined summarily by the court. *Id.* Of course, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). But so long as sufficient evidence could lead a rational trier of fact to resolve the dispute in favor of either party, granting either party's dueling motions for summary judgment would be inappropriate. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

This case, involving a complicated, multi-million dollar business transaction involving ambiguous language about which the parties offer dramatically different explanations, is particularly ill-suited to summary judgment. We recognize that Novell has powerful arguments to support its version of the transaction, and that, as the district court suggested, there may be reasons to discount the credibility, relevance, or persuasiveness of the extrinsic evidence that SCO presents. Moreover, we appreciate the difficulties that follow when the resolution of ambiguous language in a ten-year-old contract is left to trial. At trial in a case like this, the intention of the parties often "must be divined from self-serving testimony offered by partisan witnesses whose recollection is hazy from passage of time and colored by their conflicting interests." *Trident Center v. Connecticut General Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988). Even though the parties may have shared a common understanding of a transaction at the time of the deal, now that "circumstances have changed and new financial incentives have arisen, one side may wish it had a different agreement." *Nimmer on Copyright*, § 10.08. Nevertheless, when conflicting evidence is presented such that the ambiguities in a contract could legitimately be resolved in favor of either party, it is for the ultimate finder of fact—not the court on summary judgment—to interpret the contract. As we now explain, Novell's arguments do not convince us that the admissible evidence

concerning the ambiguous contract language concerning contract ownership is so one-sided as to warrant summary judgment.

Novell contends that SCO has failed to establish a disputed issue of material fact as to copyright ownership for several reasons. It first claims that SCO has failed to present any evidence to support that the APA, as revised by Amendment No. 2, clarified the agreement to indicate that SCO received ownership of some or all UNIX and UnixWare copyrights as a result of the transaction. In the alternative, it argues that SCO has failed to present any evidence to suggest that ownership of UNIX and UnixWare copyrights was "required" for Santa Cruz to exercise its rights under the APA.

In support of its initial argument, Novell argues that it has introduced undisputed evidence that (1) Santa Cruz admitted that the initial APA excluded copyrights from the asset sale and that (2) Novell expressly rejected Santa Cruz's proposal to use Amendment No. 2 to transfer copyrights to Santa Cruz. *See* Aple. Br. 39–42. As to the first point, Santa Cruz's admission that the initial APA excluded copyrights is not inconsistent with SCO's position that this exclusion was a mistake and failed to reflect the parties' intent. Novell itself admits that the negotiations that led to the language of Amendment No. 2 concerning copyrights began when Santa Cruz's attorney contacted Novell, informing them that "the Original APA explicitly excluded copyrights to UNIX and UnixWare as

assets being sold by Novell to Santa Cruz and that it shouldn't have." App'x 6063.

As to the second point, Novell directs us to various pieces of evidence supporting its claim that Amendment No. 2 was not intended to affirm that ownership of copyrights had transferred to Santa Cruz, but only "to affirm that Santa Cruz had a license under the Original APA to use Novell's UNIX and UnixWare copyrighted works in its business." App'x 6064. Novell primarily relies on evidence of the negotiations over Amendment No. 2. Santa Cruz initially proposed a draft of Amendment No. 2 that would have revised the Intellectual Property section of the Excluded Assets Schedule to read:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of this Amendment No. 2, which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder. However, in no event shall Novell be liable to SCO for any claim brought by any third party pertaining to said copyrights and trademarks.

App'x 6670. Novell rejected this language, and the final language of Amendment No. 2 instead reformed the Excluded Assets Schedule to read:

> All copyrights and trademarks, except for the copyrights owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. However, in no event shall Novell be liable to SCO for any claim brought by any third party pertaining to said copyrights and trademarks.

App'x 374. The revised language contains two relevant changes. Instead of excepting from the Excluded Assets Schedule "the copyrights . . . which *pertain*

-28-

to UNIX and UnixWare technologies" the final language refers to "the copyrights . . . *required* for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies." In addition, instead of referring to "the copyrights . . . owned by Novell as of the date of this Amendment No. 2 . . . and which SCO has acquired hereunder," the final language refers to "the copyrights . . . owned by Novell as of the date of the Agreement."

Novell contends that because it did not accept Santa Cruz's initial proposal, there is no basis for construing Amendment No. 2 as SCO would—an affirmation of the transfer of all UNIX and UnixWare copyrights. *See Apple Computer v. Microsoft Corp.*, 35 F.3d 1435, 1440–41 (no basis for construing agreement in line with draft proposal rejected by one of the parties). It insists that the language reflects its explanation of Amendment No. 2 as a mere affirmation of Santa Cruz's implied license to use the copyrights. SCO, in contrast, claims that the final language of Amendment No. 2 only represented "a different way" of saying what its initial draft proposed—a clarification that the parties' had intended for ownership of the UNIX copyrights to transfer. Aplt. Br. 44–45.

As an initial matter, we are skeptical of Novell's interpretation of the Amendment. Whatever the Amendment means, it refers to the ownership of copyrights, not to licenses. A rational trier of fact could surely find that Amendment No. 2 clarified the APA so as to indicate that at least some copyrights transferred to SCO. It is true that the final language of Amendment

No. 2, by referring to "required copyrights" rather than "copyrights that pertain to" UNIX, is narrower than that initially proposed by Santa Cruz. But is it plausible to think that Santa Cruz would have found the final language equally sufficient for its purposes, given its insistence that all the UNIX copyrights *were* required for it to exercise its rights under the deal. *See, e.g.*, Testimony of Steve Sabbath, Santa Cruz Attorney, App'x 10722 ("all of the [UNIX and UnixWare] copyrights" were "required" for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies.) Alternatively, the final language of Amendment No. 2 may have represented a compromise whereby Novell agreed to confirm that Santa Cruz obtained ownership only of those copyrights "necessary" for Santa Cruz to run its business.

Our conclusion that a rational trier of fact could find that Amendment No. 2 clarified the APA to affirm that the parties intended to transfer certain UNIX and UnixWare copyrights to Novell is bolstered by SCO's extrinsic evidence of the transaction. SCO presents testimony from a variety of witnesses involved in the business negotiations on both sides of the deal, which generally supports its version of the transaction. *See, e.g.*, Aplt. Br. 13–15. It is true, as Novell points out, that many of these witnesses were involved in the business negotiations, as opposed to the actual drafting of the contract. But because we cannot exclude the possibility that Amendment No. 2 was designed to restore the language of the transaction to the parties' actual intent during the business negotiations over the

deal, such testimony is not irrelevant. *Cf. California Pac. Title Co., Sacramento Division v. Moore*, 40 Cal. Rptr. 2d 61, 63 (Cal. Dist. Ct. App. 1964) ("A conflict in the evidence does not preclude a court from finding that the two parties had a common intent which was incorrectly reduced to writing."). Moreover, SCO's extrinsic evidence extends not only to the business negotiations preceding the contract, but also to the parties' understanding of the contractual language itself. For instance, Novell points out that the Board resolution approving the transaction on its side of the deal stated that "Novell will retain all of its patents, copyrights and trademarks." App'x 5192. But SCO notes that Mr. Frankenberg, then Novell's CEO, testified that he understood the Board resolution's reference to Novell's retention of copyrights to refer to Netware copyrights, as opposed to the core UNIX intellectual property. Aplt. R. Br. 14.

Finally, SCO presents evidence of the parties' course of performance following the transaction. Under California law, "course of performance" evidence may be used to interpret an ambiguous contractual provision. Cal. Code Civ. Proc. § 1856. *See also Universal Sales Corp. v. Cal. Press Mfg. Co.*, 128 P.2d 665, 762 (Cal. 1942) ("[P]ractical construction placed by the parties upon the instrument is the best evidence of their intention"). SCO points to a variety of steps taken by the parties following the signing of the APA and Amendment No. 2 that it claims supports its interpretation of the contract. These include Novell's modification of copyright notices on certain UnixWare source code, *see* App'x

10303–13, certain statements related to the transfer of intellectual property within transition documents following the deal, *see, e.g.,* App'x 13362, and the publication of a press release in 1995 stating that "SCO will acquire Novell's UnixWare business and UNIX intellectual property."[4] App'x 5626. Of course, such documents are not dispositive of the companies' intent at the time of the transaction. But they illustrate the difficulties with granting summary judgment here.

Novell finally argues that SCO has failed to show what UNIX copyrights are "required" for Santa Cruz to exercise its rights under the APA. The parties each argue for plausible, but diametrically opposed, interpretations of the word "required." SCO argues that the bulk of the UNIX and UnixWare copyrights are "required" in order for it to exercise its rights. For instance, the APA transferred to Santa Cruz "all of [Novell's] claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business." App'x 313. SCO argues that it could not defend any of its intellectual property against software piracy or other business harm without ownership of the copyrights. Indeed, a key reason why this litigation is so important to SCO is that it has

---

[4]Although SCO claims that this was a "joint press release," it provides no evidence to support this assertion. The district court reasonably cast doubt on whether the press release cited to in the record is, in fact, a joint press release. In any case, it at least provides a contemporaneous view of Santa Cruz's view of the transaction.

claimed that other companies, including IBM, are infringing on the proprietary technology that it supposedly received through its transaction with Novell.

Novell, in contrast, asserts that the class of "required" copyrights constitutes a null set. *See* Aple. Br. 40, 41 n.8 (arguing that Amendment No. 2 was not intended to transfer *any* copyright ownership, but merely to affirm its license to use certain copyrights). The district court agreed, noting amongst other things that "Santa Cruz had been able to pursue its UNIX business from December 6, 1995 until October 16, 1996 [the date of Amendment No. 2] without any problems due to its [alleged] lack of ownership of the copyrights." Dist. Ct. Op. 61. But the fact that SCO did not need to assert ownership of the UNIX copyrights publicly following the closing of the transaction does not indicate that the UNIX copyrights are unnecessary to SCO's full exercise of its rights under the agreement. Indeed, it would seem that neither party asserted public ownership of the copyrights until the events leading to the instant litigation, almost a decade after the closing of the transaction. *See, e.g.*, Aple. Br. 32 (noting that Novell and SCO did not file their competing copyright registrations until after this dispute arose in 2003).

We need not determine at the summary judgment stage which copyrights were "required." If the evidence presented on a dispositive issue is subject to conflicting, reasonable interpretations, summary judgment is improper. *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1234 (10th Cir. 2008). Although the

-33-

district court found that "there is . . . significant evidence that Santa Cruz did not 'require' the UNIX and UnixWare copyrights," we think SCO has presented sufficient evidence to create a triable fact as to whether at least some UNIX copyrights were required for it to exercise its rights under the agreement. Although the district court acknowledged that "SCO has submitted testimony from witnesses stating generally that the copyrights were necessary to running a software business," it found that "none of those witnesses give specific examples of how a lack of copyright ownership impeded Santa Cruz's ability to exercise its rights under the APA." Dist. Ct. Op. 61. But the documents detailing the actions of the transition team at least create ambiguity over whether the transfer of copyrights was required to support SCO's rights under the APA. *See, e.g.*, App'x 13362 ("All of the technology and intellectual assets covered by the work outlined in this document will be transitioned to SCO after December 1, 1995"). And we think it a commonsense proposition that intellectual property at least *may* be required to protect the underlying assets in SCO software business should, for instance, a UNIX licensee have attempted to resell technology licensed from SCO.[5]

_____

[5]For this reason, we fail to see why SCO's argument that copyright ownership would be necessary to bring "claims" under the agreement is "circular," as Novell argues. Aple. Br. 47. SCO indisputably acquired certain assets under the APA. SCO's claim, as we understand it, is that copyrights are necessary to protect the value of the assets themselves, and are therefore necessary to prosecute seller's claims "relating to any . . . asset" included in the

(continued...)

-34-

Because we conclude summary judgment is inappropriate on the question of which party owns the UNIX and UnixWare copyrights, we must likewise reverse the district court's determination that "Novell is entitled to summary judgment [on SCO's claim] seeking an order directing Novell to specifically perform its alleged obligations under the APA by executing all documents needed to transfer ownership of the UNIX and UnixWare copyrights to SCO." Dist. Ct. Op. 62. We take no position on which party ultimately owns the UNIX copyrights or which copyrights were "required" for Santa Cruz to exercise its rights under the agreement. Such matters are for the finder of fact on remand.

### III. Novell's Waiver Rights under Section 4.16(b) of the APA

The other chief dispute between the parties concerns the extent of Novell's rights under the APA to waive or modify rights under SVRX Licenses. Section 4.16(a) of the APA provides that "Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a) hereof an referred to herein as "SVRX Royalties")." Section 4.16(b) preserved to Novell certain waiver rights with regard to SVRX Licenses. It states that:

> Buyer shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior

(...continued)
Business. Novell has not explained, for instance, what recourse SCO had under Novell's theory of the transaction if a third party had copied and attempted to resell the core UNIX assets Santa Cruz received in the deal.

-35-

written consent of Seller.  In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller.

App'x 287.  In 2003, after SCO had claimed that IBM and Sequent had violated certain software and sublicensing agreements, Novell directed SCO "to waive any purported right SCO may claim to terminate IBM's SVRX Licenses . . . ."  Aple. Br. 19.  The scope of Novell's waiver rights turns on the meaning of the term "SVRX License."

The APA provides some assistance in interpreting the meaning of an "SVRX License."  Section 4.16(a) of the APA indicates that SVRX Licenses are "listed in detail under item VI of Schedule 1.1(a) hereof."  Item VI of Schedule 1.1(a) states that among the assets transferred to SCO under the APA are "[a]ll contracts relating to the SVRX Licenses listed below."  As the district court recognized, however, the list provided in Item VI is not "a list of license agreements," but instead "a list of SVRX software releases," or products.  Dist. Ct. Op. 77.

The parties principally contest whether Novell's waiver rights extend to all three types of agreements bearing upon the licensing of SVRX technology—software agreements, sublicensing agreements, and product supplement agreements (or Product Schedule Licenses)—or just to product supplement agreements.  Aple. Br. 17; Aplt. Br. 19.  Software agreements specify

a licensee's rights to modify and prepare derivative works based on source code and binary code. *See* Dist. Ct. Op. 82; Aple. Br. 16. Sublicensing agreements set out the general conditions governing the licensee's use of the product and grant certain rights to distribute binary code. *See* Dist. Ct. Op. 82; Aplt. Br. 18. According to SCO, both of these agreements required licensees to keep UNIX source code and derivatives confidential. *See* Aplt. Br. 18. Product supplement agreements, in contrast, actually identify the product the licensee has a right to use, the CPUs on which it has that right, and the fees that the licensor has a right to receive in exchange. These agreements authorize licensees to sell a UNIX-derivative product in exchange for remitting certain royalties to the current owner of the UNIX business. As SCO points out, each licensee executed a single umbrella Software and Sublicensing agreement with AT&T (or later Novell), which purported to govern any product added to the relationship by a product supplement agreement. When a licensee secured a license to use a SVRX product, it would execute a product supplement agreement, and the software product would "become subject to" the previously executed umbrella agreements. *See, e.g.*, App'x 1471.

Novell contends that the APA's reference to *any* SVRX license "plainly means that the term 'SVRX Licenses' under the APA includes all contracts relating to the UNIX **S**ystem **V R**eleases listed in Item VI." Dist. Ct. Op. 77 (emphasis added). SCO argues that the term SVRX Licenses is ambiguous on its

face, but suggests that it refers only to product supplement agreements related to the products listed in Item VI. The district court agreed with SCO that there was "some ambiguity in the APA's attempt to define SVRX licenses," but found that Novell's interpretation of the term—as referring to all System V Release licenses—was "the only reading that is consistent with all of the APA's provisions, its Schedules, and its Amendments." Dist. Ct. Op. 88. It also noted that "[e]ven if this court were to consider SCO's extrinsic evidence, it does not uniformly support SCO's interpretation as SCO claims. If the contract language was susceptible to SCO's interpretation, SCO's evidence would, at most, create only a question of fact for the jury." *Id.* at 86 n.6.

Of course, if SCO's evidence is sufficient to "create a question of fact for the jury," this is sufficient to enable SCO to survive summary judgment. But the district court found summary judgment appropriate, concluding that despite ambiguity in the meaning of "SVRX Licenses," "there is no support in the language and structure of the APA for SCO's interpretation of SVRX License to mean product supplements rather than the entire set of agreements relating to the licensing of SVRX code." Dist. Ct. Op. 86. We review the conclusions of the district court de novo.

**A. Is the Scope of Novell's Waiver Rights Ambiguous?**

As an initial matter, we agree with the district court that there is some ambiguity in the scope of the term "SVRX License." While the APA expressly

-38-

indicates that SVRX Licenses are listed in Item VI of 1.1(a), that list refers only to products. While this product list may resolve ambiguity over the meaning of *SVRX*, it does not reveal what is intended by "rights under any . . . SVRX License" in Section 4.16 of the APA. Novell argues that "license" is "an ordinary word that needs no definition." Aple. Br. 52. But we are skeptical that this resolves its meaning for several reasons.

First, under California law, "[t]he words of a contract are to be understood in their ordinary and popular sense . . . *unless* used by the parties in a technical sense." Cal. Civ. Code § 1644 (emphasis added). As SCO points out, the APA expressly made "SVRX License" a defined term, albeit one defined with some lack of clarity. Second, it is not clear to us that even the "ordinary meaning" of rights under a license is so broad as to encompass the kind of rights Novell seeks to assert. Black's Law Dictionary (8th ed. 2004), for instance, defines license as "[a] permission, usually revocable, to commit some act that would otherwise be unlawful" or the "document evidencing such permission." In line with this definition, the sublicensing and software agreements grant certain rights to licensees, for instance, enabling them to use, modify, and prepare derivative works based on a given software product. But as we understand Novell's argument, it does not seek to waive rights given to the licensee in the licensing agreement—but rather the licensor's (SCO's) ability to enforce the *boundaries* of those rights extended to licensees. This would be a broad power indeed. For

instance, the sublicensing agreements expressly provided that "no title to the intellectual property in the sublicensed product is transferred to [the licensee]." *See* App'x 1493 (Section II(a)(II): Grant of Rights). If we read Novell's waiver rights as broadly as it asks us to, however, Novell could waive this limitation at its sole discretion, thereby divesting SCO of all title to any intellectual property in any UNIX product for which a sublicensing agreement existed. Similarly, Novell's interpretation of Section 4.16 would mean it was free to waive limitations on a licensee's ability to copy, transfer, or sell the derivative products it created based on UNIX, *see* App'x 1472, something that would substantially limit the value to Santa Cruz of its UNIX ownership rights.

Given that the APA expressly provides Novell the power to direct SCO to "amend, supplement, modify, or waive any rights under any SVRX License," we cannot say that Novell's interpretation of Section 4.16 is foreclosed by the dictionary. But the California Supreme Court has made clear that the "dictionary definition[] of a word" does not necessarily yield "the 'ordinary and popular' sense of the word if it disregards the [contract's] context." *MacKinnon v. Truck Ins. Exchange*, 73 P.3d 1205, 1214 (Cal. 2003). To read Novell's rights as broadly as it asks would give it unlimited power not only to reduce or increase its *own* rights under an SVRX License after the APA (namely rights to royalties), but also to direct SCO to supplement a licensee's substantive rights "in any manner," even if by doing so, Novell forced SCO to divest rights unquestionably owned by

SCO after the transaction.[6] As SCO argues, this would enable Novell, at its sole discretion, to destroy a substantial part of the value of Santa Cruz's acquisition of the UNIX business. Although Novell argues that "the APA provided consideration to Santa Cruz independent of UNIX System V, including . . . the right to develop new products based on UNIXWare . . .[,] customer lists . . .[, and] office furniture," this misses the mark. The issue is not whether independent consideration existed, but whether it is consistent with the context of the deal to imagine that Santa Cruz would have paid the price that it did if this was the only value it obtained in the deal, unencumbered from Novell's powerful discretionary rights to control the underlying UNIX source code.

Finally, even if we considered "rights under . . . any SVRX License" to be unambiguous on its face, California law would still permit the introduction of extrinsic evidence to expose a latent ambiguity in the contract's language. *Dore*, 139 P.3d at 60. Similarly, California directs us to consider the parties' course of performance not only for purposes of "ascertaining the meaning of the parties' agreement," but also to "supplement or qualify the terms of the agreement." *Employers Reinsurance Co. v. Superior Court*, 161 Cal. Rptr. 3d 733, 745 (Cal. Ct. App. 2008) (citing Cal. Com. Code § 1303). As we now explain, this

---

[6] Section III.L of the Asset Schedule of the APA transferred to Santa Cruz "[a]ll of Seller's rights pertaining to UNIX and UnixWare under any software development contracts [or] licenses . . . and which pertain to the Business, including without limitation: . . . Software and Sublicensing Agreements."

evidence at least creates ambiguity regarding the scope of Novell's waiver rights under the agreement.

**B. Is the Scope of Novell's Waiver Rights Susceptible to SCO's Reading?**

Although the parties present a variety of arguments concerning the extrinsic evidence bearing on the parties' intent at the time of the APA and the parties' course of performance, we think a discussion of the events leading to "Amendment No. X" between IBM, SCO, and Santa Cruz is sufficient to illustrate both that the scope of Novell's waiver rights is ambiguous and that Section 4.16 is at least susceptible to SCO's interpretation.

In April 1996, several months after the transaction closed, Novell entered into direct negotiations with IBM for the purpose of revising IBM's rights under its licensing agreement for SVRX technology. Although Novell acknowledged that all rights under the software and sublicensing agreements had been transferred to SCO under the APA, it professed the right to amend IBM's rights under its licensing agreement, stating:

> Except for all right, title and interest to the Software Product royalties (less an administration fee to SCO for administering the collection of such royalties), SCO purchased the Related Agreements [the relevant software, sublicensing, and product supplement agreements] in an Asset Purchase Agreement between Novell and SCO dated September 19, 1995 (the "SCO Agreement"). In the SCO Agreement, Novell has the right to amend the Related Agreements on behalf of SCO under certain circumstances applicable in this instance.

App'x 10400. The agreement enabled IBM to "buy out" its ongoing royalty obligations in exchange for a one time fee. In addition, Novell purported to expand IBM's freedom to share licensed technology with third parties. *See* App'x 10401 (describing "relief" of certain limitations on IBM's rights under the Related Agreements). As Novell prepared to enter into its agreement with IBM, it wrote SCO, requesting that it "revise the terms and conditions of IBM's Software License and Sublicense Agreements with Novell." App'x 3876. Thus, Novell's asserted ability under the APA to require SCO to amend or waive rights under the Software and Sublicensing Agreements, even when it would expand a licensee's rights with regard to SVRX source code—the precise issue in controversy today—was implicated by Novell's 1996 negotiations with IBM and SCO.

Novell denied that its proposed agreement with IBM would have authorized IBM to "sub-license source code," and suggested that it granted only limited additional rights to IBM, such as "allowing IBM's major accounts to make temporary fixes from AIX source code." App'x 3887. SCO, however, interpreted the agreement as impinging on its asserted "ownership and exclusive rights to license the UNIX source." App'x 3890. Ultimately, the parties agreed to revise Novell's proposed agreement with IBM, and SCO became a party to the agreement. Among other things, the final agreement excised the language that "Novell has the right to amend the Related Agreements on behalf of SCO under certain circumstances applicable in this instance," replacing it with the more

-43-

general language, "SCO purchased, and Novell retained, certain rights with respect to the Related Agreements."[7] SCO also received a payment of $1.5 million from Novell in exchange for a release of claims relating to the buy out of IBM's royalty obligations. SCO contends that this payment definitively signaled Novell's "capitulat[ion] to Santa Cruz's claims" of ownership and exclusive licensing rights concerning UNIX source code. We agree with Novell that this reading goes too far. Parties may choose to settle claims for a variety of reasons unrelated to their merits, not the least to avoid expensive litigation or to maintain civility in an important commercial relationship. Indeed, the agreement expressly provided that the settlement should not "be deemed . . . an admission of the truth or falsity of any claims heretofore made." App'x 3917; *see also* Fed. R. Evid. 408(a)(1) (Evidence of furnishing or accepting a valuable consideration in compromising a claim is not admissible on behalf of any party, when offered to prove validity of a disputed claim.).

More relevant, however, is the amendment to the APA that followed after resolution of the tripartite negotiations. In addition to addressing the intellectual

---

[7]As we noted with respect to the negotiations over Amendment No. 2's revision to the Intellectual Property Excluded Assets Schedule, the fact that the final language of the agreement eliminated the specific language affirming Novell's right under the APA to amend sublicensing and software agreements should not be construed as an admission by Novell that it does not have such rights.

property exchanged through the APA, Amendment No. 2 also set out conditions

for any future buy-out of a licensee's royalty obligations. It provided that:

> [N]otwithstanding the provisions of Article 4.16 . . . any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations shall be managed as follows: . . .
>
> This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX code, nor does it give Novell the right to grant new SVRX source code licenses. *In addition*, *Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the agreement.*

App'x 374, ¶B.5 (emphasis added).

The district court concluded that Amendment No. 2 "provides no insight

into the source code rights SCO had or did not have under Section 4.16(b) of the

original APA," because the heading for this section of the Amendment makes

clear that it refers only to situations involving buyouts of royalty obligations. But

at least some of SCO's extrinsic evidence supports its assertion that this provision

was meant to affirm that Novell's rights *under the APA* precluded Novell from

unilaterally expanding a third party's rights to source code. *See, e.g.*, App'x

10725, 10730. This would also explain why Amendment No. 2 took pains to

clarify that the "Amendment does not give Novell the right to increase any SVRX

licensee's rights to SVRX code." If Novell already had the right under the APA

itself to force SCO to increase any SVRX licensee's rights to SVRX code, then

this provision would be pointless and ineffectual. Of course, it is plausible to

think that this provision merely preserved an ambiguous status quo—but that is

consistent with our conclusion that neither party's interpretation of Novell's waiver rights is foreclosed by the language of the APA.

Novell resists the conclusion that Section 4.16's waiver rights are not susceptible to SCO's interpretation—that they apply primarily to the royalty provisions of the product supplement agreements—for several reasons. First, Novell asserts that the product supplement agreements "refer to the Software and Sublicensing Agreements, which in turn refer to the Supplements as part of the same integrated agreement." Aple. Br. 52. As parts of essentially integrated agreements, Novell argues that SVRX Licenses must refer to the entire set of agreements governing the license relationship. But several SCO witnesses, who had previously worked at Novell before the transaction testified that they "understood an SVRX license to be an SVRX product supplement." *See* App'x 4610, 4625; *see also* App'x 4609–10 ("While the software and sublicensing agreements described general rights and obligations that would apply if a licensee licensed a product, they did not themselves license any product.").

The district court also found persuasive the argument that Section 4.16(b) indicates that an SVRX License must be something that grants rights. *See* App'x 287 ("at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any *rights under* . . . any SVRX License."). Novell argues that the software and sublicensing agreements, rather than the product supplement agreements, set out the licensee's rights and obligations. Therefore, it contends

that the "rights under" the SVRX License must refer to the rights in the software and sublicensing agreements. But it is clear that the product supplement agreements also grant rights—specifically the right to license and use a given product in exchange for financial compensation.

Finally, Novell argues, and the district court agreed, that its reading of SVRX Licenses to include all three sets of licensing agreements is most consistent with the APA's use of broad language referring to "any" and "all" SVRX Licenses. But we think it plain that this only begs the question of the scope of what an "SVRX License" is.

Ultimately, we do not think that the language of Section 4.16 is so clear as to preclude SCO's interpretation of the scope of Novell's waiver rights. It is reasonable to think that the parties would have covenanted in such a manner as to protect Novell's substantial pecuniary interest in the revenue stream that, even under SCO's interpretation, financed the acquisition. It is less easy to accept that SCO would have consented to giving Novell the unilateral power to unravel its exclusive and undisputed ownership rights in the underlying source code of UNIX. Because we cannot say that the evidence is so one-sided as to preclude a rational finder of fact from agreeing with SCO's interpretation of the scope of Novell's waiver rights, we think summary judgment is premature.

**IV. Limitations Imposed by the Covenant of Good Faith**

SCO also argued below that the covenant of good faith and fair dealing independently limits the scope of Novell's waiver rights under the APA. Under California law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371, 6 Cal. Rptr. 2d 467 (Cal. 1992). "The covenant of good faith finds particular application in situations," as here, "where one party is invested with a discretionary power affecting the rights of another." *Id.* "[B]reach of the covenant of good faith has been characterized as an attempt by the party holding the discretionary power to use it to recapture opportunities forgone in contracting." *Id.* at 372; *see also* Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 373 (1980). That said, "[i]t is universally recognized [that] the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Id.*

The district court concluded that the covenant of good faith was inapplicable to constrain Novell's waiver rights, as a matter of law, reasoning that Novell would be "acting within an explicit grant of contractual authority." Dist. Ct. Op. 87 (citing *Carma Developers, Inc.*, 2 Cal. 4th at 374). Because we conclude that the scope of Novell's waiver rights is not clarified expressly by the contract, we must reverse the district court's judgment on this point.

On remand, however, we caution that it is not always the case that an express grant of contractual authority is not constrained by the operation of the covenant of good faith. California recognizes at least two exceptional situations where the covenant of good faith may inform the interpretation of even an express grant of contractual authority. First, where the express discretion makes the contract, viewed as a whole, "contradictory and ambiguous," the implied covenant may be applied to aid in construction. *April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 816 (Cal. Ct. App. 1983). Thus in *April Enterprises*, by the express terms of a contract, one party had the right to syndicate episodes of a television show, while the other had the right to erase episodes of the show. Both parties shared revenues from compensation. Although the contract expressly granted one party the right to erase episodes, the court applied the covenant of good faith, holding that the contract was contradictory and ambiguous as to whether tapes could be erased while the other party was negotiating for syndication. *Id.* Second, the covenant may aid in the interpretation of a contract seemingly expressly granting unbridled discretion "in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement." *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808 (Cal. Ct. App. 1995).

On remand, the district court may consider the applicability of either of these exceptions to the general rule that an express grant of contractual authority is not susceptible to limitation by the covenant of good faith.

**V. Novell's Entitlement to SVRX Licenses Entered Into After the APA**

The parties finally dispute Novell's entitlement to royalties from an agreement entered into between SCO and Sun and Microsoft in 2003 concerning Sun's rights to SVRX technology. Pursuant to the 2003 agreement, Sun paid SCO roughly $9 million in exchange for an amendment to its rights under a 1994 SVRX License between Novell and Sun. In 1994, Sun paid Novell $83 million in exchange for a buyout of its royalty obligations under its licensing agreement. Most importantly, the 2003 agreement purported to lift Sun's obligation under the 1994 agreement to keep licensed SVRX source code confidential. *See* Aple. Br. 66. These confidentiality restrictions would have prevented Sun from publicly releasing or "opensourcing" the source code for its proprietary, UNIX-based operating system, "Solaris," until 2014. After entering into its 2003 agreement with SCO, Sun released an opensource version of Solaris that would have been barred under the 1994 agreement.

The district court ruled for several independent reasons that Novell was due a share of the revenues that SCO had obtained in exchange for the amendment to Sun's licensing rights. First, the court held as a matter of law that the 2003 agreement constituted an "SVRX License" within the meaning of the APA, to

-50-

which Novell was due royalties under the APA. *See* Dist. Ct. Op. 100–01.

Second, in a bench trial, the district court concluded that the 2003 agreement was an unauthorized amendment to an SVRX License (Novell and Sun's 1994 agreement), expressly prohibited by Article 4.16(b) of the APA. The court further noted that Amendment No. 2 to the APA provides that before entering into any potential transaction with an SVRX licensee which "concerns a buy-out of any such licensee's royalty obligations," SCO was obligated to notify Novell and engage it in the negotiations. Findings of Fact, July 16, 2008 at 35 (referencing App'x 374, ¶ B). Because the court concluded that SCO was without authority to enter into the 2003 Sun Agreement, it found SCO liable for breach of fiduciary duty, conversion, and unjust enrichment from its failure to pass through to Novell certain revenues that it received from its agreement with Sun. The court awarded Novell $2,547,817. We review the district court's factual findings for clear error and its legal conclusions de novo. *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1260 (10th Cir. 2007).

In its opening brief on appeal, SCO appeared to contest only the district court's finding that the 2003 agreement constituted an "SVRX License." SCO argued that the district court erred by concluding that a licensing agreement entered *after* the closing of the APA could constitute an SVRX License. Whatever the merits of this argument, SCO neglected to challenge the alternative, independently sufficient basis for the district court's ruling—that its 2003

-51-

agreement with Sun represented an impermissible amendment to an SVRX License. An issue or argument insufficiently raised in a party's opening brief is deemed waived. *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277–78 (10th Cir. 1994). Although SCO addresses this issue in its reply brief, the general rule in this circuit is that a party waives issues and arguments raised there for the first time. *See M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753 (10th Cir. 2009).

Even if the issue were properly before us, we are skeptical of the merits of SCO's claim. Even if "SVRX Licenses" include only those licenses entered into prior to the APA, as SCO argues, Sun's 1994 agreement with Novell would qualify. Section 4.16(b) of the APA makes clear that SCO "shall not have the authority to[] amend [or] modify . . . any right under . . . any SVRX License without the prior written consent of Seller." SCO does not dispute that the royalties provided by Sun under its licensing agreement constitute a right within the meaning of Section 4.16. Instead it contends that "the 1994 buyout was not modified in any way" because Novell was not required to relinquish any of the money it received from the 1994 buyout. But the 2003 agreement expressly purports to "amend and restate" the parties' 1994 agreement, by increasing the value of Sun's rights under its buyout. And even if Section 4.16 did not apply to the 2003 agreement, we agree with the district court that Amendment No. 2 would. Paragraph B of the Amendment sets out rules to govern "any potential transaction with an SVRX licensee which *concerns* a buy-out of any such

-52-

licensee's royalty obligations." App'x 374 (emphasis added). SCO argues that "Section B does not apply when a licensee already has a buyout and now enters into a subsequent agreement that merely relates to the prior buyout agreement." Aplt. R. Br. 30. But we fail to see any support in the language for this limitation. Indeed, were this so, Amendment No. 2 would only have obligated the parties to jointly negotiate an initial buyout agreement. But Amendment No. 2 would not have prevented the parties from taking unilateral action to expand or modify the terms of that buyout thereafter. *See* Findings of Fact, July 16, 2008 at 35–36. This seems counterintuitive.

In any case, we also agree with the district court that agreements that post-date the APA may constitute SVRX Licenses. SCO presents a variety of evidence to suggest that SVRX referred only to existing licenses under the APA. *See* Aplt. Br. 66–68. This may have been consistent with the parties' intent at the time of the APA, which expressly provided that SCO "shall have no right to[] enter into future licenses or amendments of the SVRX Licenses." App'x 287. But the parties subsequently agreed to Amendment No. 2, which revised this section of the APA to provide that SCO "shall not, and shall have no right to[] enter into new SVRX Licenses *except* in [certain enumerated situations]." Thus, the clear language of the amended APA anticipates "new SVRX Licenses," indicating that an SVRX License can post-date the APA. To the extent that SCO argues that this amended language envisioning "new SVRX Licenses" is somehow inconsistent

-53-

with the APA itself, we remind it that when "two contracts are made at different times, [but where] the later is not intended to entirely supersede the first, but only modif[y] it in certain particulars[,] [t]he two are to be construed as parts of one contract, the later superseding the earlier one wherever it is inconsistent therewith." *Hawes v. Lux*, 294 P. 1080, 1081 (Cal. Dist. Ct. App. 1931).  What is sauce for the goose is sauce for the gander.  Since SCO's challenge to the district court's ruling was premised only on its argument that "SVRX License" is a term temporally limited to assets existing at the time of the APA,[8] *see* Aplt. Br. 66, we are compelled to reject it.

For all these reasons, we affirm the district court's ruling with respect to SCO's liability from its 2003 agreement with Sun.

## VI. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's judgment with regards to the royalties due Novell under the 2003 Sun-SCO Agreement, but **REVERSE** the district court's entry of summary judgment on (1) the ownership of the UNIX and UnixWare copyrights; (2) SCO's claim seeking specific performance; (3) the scope of Novell's rights under Section 4.16 of the APA; (4)

---

[8]SCO notes in its reply brief that the provision referring to "new SVRX licenses" provides that SCO retains the source code right-to-use fees thereunder.  But the district court found that SCO was unjustly enriched not with regard to right-to-use fees, but by SCO's willingness to provide Sun with relief from the confidentiality restrictions imposed by the 1994 agreement.

the application of the covenant of good faith and fair dealing to Novell's rights

under Section 4.16 of the APA.  On these issues, we **REMAND** for trial.