**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 30, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

THE SCO GROUP, INC., a Delaware
corporation,

        Plaintiff/Counterclaim Defendant -
        Appellant,

v.

NOVELL, INC., a Delaware corporation,

        Defendant/Counterclaim Plaintiff -
        Appellee.

No. 10-4122
(D.C. No. 2:04-CV-00139-TS)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **SEYMOUR**, and **HOLMES**, Circuit Judges.

This contract interpretation case is the second appeal arising out of a dispute

between SCO Group, Inc. and Novell, Inc. over copyright ownership of early versions of

the UNIX operating system and the scope of Novell's rights in licenses issued to its

former customers prior to its partial sale of UNIX to SCO. In the first appeal, we

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). Id.

reversed a summary judgment in favor of Novell because questions of material fact remained on these issues. *See SCO Group v. Novell*, 578 F.3d 1201 (10th Cir. 2009) (*Novell I*), *cert. dismissed*, 131 S. Ct. 51 (2010). On remand, after a two-week trial, a jury determined Novell owned the copyrights. Separately, the district judge concluded Novell retained rights in the licenses which included the right to prevent SCO from terminating a UNIX license issued before the transfer. SCO challenges both determinations and claims evidentiary errors also require reversal. We affirm.

## I. FACTUAL BACKGROUND

A.    Novell's Purchase of UNIX from AT&T

In the late 1960's, AT&T developed UNIX, a computer operating system, and began licensing UNIX source code to its customers. These customers, in turn, would modify the source code to create customized platforms for internal use as well as for sale to end users. In 1993, Novell purchased the UNIX program development and licensing business from AT&T for over $300 million. It continued to license older versions of UNIX source code (referred to as SVRX, with X being the number of the licensed release) and developed its own customized UNIX platform, UnixWare. Two years later, Novell decided to sell the business.[1]

B.    Novell's Sale to SCO

Originally, Novell envisioned selling the entire UNIX business to a company that would develop a version of UNIX integrated with Novell's network software capable of

---

[1] For convenience we refer to the buyer as SCO; in fact, the actual purchaser was Santa Cruz, a predecessor company to SCO.

competing with operating systems like Microsoft's NT.  SCO was a good candidate

because, although smaller than some of the other potential buyers, it did not have its own

hardware business and would be more likely to agree to develop a broadly functional

version of UNIX for use on all types of hardware.[2]  Because it was a small company,

however, SCO was unable to finance the purchase of the entire business.  Novell altered

its original vision and structured a deal SCO could afford by means of an Asset Purchase

Agreement (APA).[3]

The parties signed the APA in September 1995 but the transaction did not close[4]

until December of that year.  The original version of the APA did not include copyrights

in the list of transferred assets.  In fact, it specifically excluded "[a]ll copyrights and

trademarks, except for the trademarks UNIX and UnixWare" from the sale.  (R. Vol. IX

at 3166).  Before closing, the parties signed Amendment No. 1 to the APA.  Amendment

No. 1 made numerous changes to the original document but did not alter the language

excluding copyrights from the sale.[5]  The parties amended the APA again in October

---

[2] Many of the companies developing UNIX-based systems tailor the software to be most efficient on their own hardware systems.  Novell did not want to sell to a company likely to promote its own hardware at the expense of UNIX's market reach.

[3] SCO contends the changes to the transfer were mere financing accommodations while Novell argues the deal was completely restructured and valuable assets, including the copyrights, were held back because of SCO's inability to pay cash for the full business.

[4] The APA did not transfer the assets and the parties continued to work on the deal until they signed closing documents in December.  (*See* Appellant's Br. at 5.)

[5] The document signed at closing was not a new agreement but merely executed the transaction laid out in the APA with the incorporation of later changes.  *See Novell I*, 578 F.3d at 1211.

1996, nearly a year after the close of the transaction. Relevant here, Amendment No. 2 modified the language regarding assets to exclude, "[a]ll copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement *required for SCO to exercise its rights* with respect to the acquisition of UNIX and UnixWare technologies." (*Id.* at 3219) (emphasis added).

Under the original APA, Novell retained the right to the royalties collected by SCO on SVRX licenses with a 5% administrative fee to be paid to SCO after collection. The APA restricted SCO's rights with respect to the licenses as follows:

> [SCO] shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior written consent of [Novell]. In addition, at [Novell]'s sole discretion and direction, [SCO] shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by [Novell]. In the event that [SCO] shall fail to take any such action concerning the SVRX Licenses as required herein, [Novell] shall be authorized, and hereby is granted, the rights to take any action on [SCO]'s own behalf. [SCO] shall not, and shall have no right to, enter into future licenses or amendments of the SVRX Licenses, except as may be incidentally involved through its rights to sell and license the Assets or the Merged Product . . . or future versions of the Merged Product.

(Id. at 3134) This language was not altered by the amendments.

1.     SCO's Attempts to Assert Ownership Rights in UNIX

By 2002, the UNIX business was not as profitable as SCO had hoped. To raise revenues, SCO sought to aggressively "market" UNIX licenses to users of Linux, a competing platform, on the theory that Linux incorporated portions of the UNIX code. [6]

---

[6] Linux is an open-source platform in which the underlying source code is free and available for anyone to develop. The SCO Source division was formed on the theory

- 4 -

SCO asked Novell to clarify the two companies' respective interests in the UNIX copyrights and invited Novell to participate in the aggressive pursuit of Linux users under SCO's newly formed SCO Source licensing division. Novell declined the offer.[7] Subsequently, SCO sent warning letters to Linux users (including Novell) asserting rights to part of the Linux code. The letters informed Linux users SCO had sued IBM[8] for violating its UNIX license by contributing proprietary code to Linux and it was "prepared to take all actions necessary to stop the ongoing violation of [its] intellectual property or other rights." (R. Vol. XI at 4213.) SCO also attempted to terminate IBM's UNIX license. Novell reacted by publicly asserting ownership of the UNIX copyrights and, pursuant to the waiver provision of the APA, directed SCO to waive its right to terminate IBM's UNIX license. When SCO did not comply, Novell executed documents waiving whatever rights SCO had under the IBM licensing agreements.

## II. PROCEDURAL BACKGROUND

Claiming it owned the copyrights to UNIX and Novell had no right under the APA to waive its claims against IBM, SCO sued Novell for slander of title and sought to compel Novell to transfer ownership of the copyrights to it. Novell counterclaimed alleging slander of title, breach of contract, and unjust enrichment. (R. Vol. I at 96)

---

current versions of Linux illegally incorporate portions of the UNIX code and Linux users therefore need UNIX licenses in order to use the Linux operating system without infringing on UNIX copyrights.

[7] Shortly after the dispute began, Novell announced plans to acquire SUSE, a Linux platform, anticipating that the market was turning toward the open source software. Novell was planning the acquisition at the time SCO contacted it to request help with SCO's inventive licensing theory.

[8] IBM had a longstanding UNIX license it purchased originally from AT&T.

- 5 -

Both parties amended their pleadings to add claims and then filed cross motions for summary judgment. The district court entered a summary judgment in favor of Novell. We reversed and remanded for trial on: (1) the ownership of the UNIX and UnixWare copyrights; (2) SCO's specific performance claim; (3) the scope of Novell's rights under the APA to direct SCO to waive its claims against IBM for alleged breach of its UNIX license; and (4) the application of the covenant of good faith and fair dealing as it related to Novell's claimed rights to waiver under the APA. *Novell I*, 578 F.3d at 1227.

The parties stipulated to trying SCO's slander of title claim to a jury but left to the judge the resolution of SCO's request for specific performance, the scope of Novell's waiver rights under the APA, and whether, under the circumstances, Novell had breached the covenant of good faith and fair dealing by exercising its waiver rights.

At the close of the evidence, the judge denied both parties' motions for judgment as a matter of law.[9] The jury found Novell had not transferred the copyrights to SCO, which resolved SCO's slander of title claim in Novell's favor.

SCO renewed its request for judgment as a matter of law and moved for a new trial. The judge denied both motions and also 1) denied SCO's request for specific performance, 2) decided the parties' contract gave Novell the right to direct SCO to waive its licensing claims against IBM, and 3) concluded Novell had not breached the implied covenant of good faith and fair dealing.

---

[9] The court eventually granted SCO's motion for judgment on Novell's slander of title counterclaim but that decision is not at issue in this appeal.

## III. DISCUSSION

SCO argues the district court erred in denying its Rule 50 motion and motion for new trial on its slander of title claim. It challenges the court's findings of fact and conclusions of law on its specific performance and breach of the covenant of good faith and fair dealing claims. It also argues erroneous evidentiary rulings prejudiced its case.

A.     Evidentiary Issues

SCO challenges several of the district court's evidentiary rulings. Our review is for abuse of discretion. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).

1.     Admission of Summary Judgment Rulings

In a motion in limine, SCO sought to exclude Novell from introducing into evidence the summary judgment rulings we reversed in *Novell I*. The judge granted the motion before trial. But, at trial, SCO argued the period of Novell's purported slander extended to the present day. It did so despite admonishment from the court that such arguments were "unwise and inappropriate" and warning that if SCO continued its inquiry the court may "revisit" its ruling. (R. Vol. VII at 2363.) Even so, SCO's counsel elicited testimony from its damages expert based on calculated damages including those SCO allegedly incurred after the district court had issued its summary judgment rulings in Novell's favor and prior to this Court's reversal. Novell sought permission to cross-examine the expert with quotes from the district court's June 4, 2004 and June 9, 2004 summary judgment rulings to show the jury the expert's calculations failed to take into account the effect of the rulings on SCO's slander claim and purported damages . The

court granted Novell's request but issued a limiting instruction contemporaneous with the

discussion of the June 4th ruling, stating:

> Now, ladies and gentlemen, I want to give you an instruction right now . . . . I want you to listen to this very carefully.
>
> In light of the testimony that is being elicited on prior court decisions in this matter, I want you to listen to this. You will hear evidence about prior court rulings in this case. And it may lead you to wonder why are we being asked to serve as jurors at this point in time in light of those prior decisions. You have to be aware that SCO appealed the ruling by the District Court, this decision and perhaps another decision that you may yet have reference to, to the Tenth Circuit Court of Appeals. The Tenth Circuit Court of Appeals in a unanimous decision reversed the District Court as to the issues before you in this case and concluded that those issues were to be decided by a jury.
>
> And so it is important for you to understand that reference to these prior decisions does not in any way affect the decisions that you will be making in this case because they were reversed and found to have been in error in a unanimous decision. Thank you.

(*Id.* at 2549). After Novell's counsel referenced the summary judgment ruling, the court

again instructed the jury "to the extent that language . . . pertains to the issues in this case,

you are to disregard it." (*Id*. at 2550). SCO argues the court abused its discretion in

admitting the rulings as they were irrelevant and "highly prejudicial."[10] (Appellant Br. at

p. 56). We see no abuse of discretion.

We accord "deference to a district court's familiarity with the details of the case

---

[10] Although neither party cited to the rule in its brief, SCO objected at trial under Rule 403 of the Federal Rule of Evidence:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

and its greater experience in evidentiary matters. This is particularly true with respect to Rule 403 since it requires an on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant." *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1083 (10th Cir. 2010) (citation and quotation omitted).

The prior court rulings were relevant because the jury was instructed to consider slanderous only those statements uttered with constitutional malice, i.e., with "(1) knowledge that it was false; or (2) reckless disregard of whether it was true or false." (R. Vol. VI at 1952). SCO's expert's damages calculation included damages for slander continuing even after summary judgment was entered against it (concluding Novell owned the copyrights). Therefore, Novell's subsequent claims to ownership from the date the summary judgment was entered in its favor until the summary judgment was reversed could not, as a matter of law, have been slanderous, *i.e.*, made with knowledge of or with reckless disregard of their falsity, Novell had a court ruling in its favor on the issue. The rulings were relevant to limit the period of the claimed slander as well as to refute SCO's claim that its damages were caused by Novell, as opposed to other events, during that period.

The evidentiary ruling most probably was prejudicial to SCO, as it claims. However, it was probably just as prejudicial to Novell. Its claim to own the copyrights and have the right to waive SCO's claims against IBM – the very matters at issue – had been resolved in its favor but the decision was later "found to have been in error." (R. Vol. VII at 2549). Moreover, the risk of prejudice was significantly reduced by the

court's ardent limiting instruction informing the jury the rulings should have no effect on its decision and that the rulings had been found to be erroneous. *See United States v. Jones*, 530 F.3d 1292, 1299 (10th Cir. 2008) ("We presume that juries follow limiting instructions.") Given the extreme care taken by the district court to avoid presentation of this evidence to the jury, the opportunities for SCO to assist the court in avoiding such necessity, and the careful instruction of the jury following its admission, there was no abuse of discretion in permitting this limited use of the earlier rulings.

      2.      Reference to Original Agreement without Reference to Amendment 2

SCO contends the district court abused its discretion when it permitted certain witnesses to testify about the original APA language without allowing SCO to cross-examine those witnesses regarding the changes implemented by Amendment 2.[11] We reject its argument.

In *Novell I*, we decided the contract documents must be construed together and extrinsic evidence regarding the parties' intent over the entire course of the transaction, including the drafting and negotiation of the original language, was admissible as relevant to the interpretation of the combined instrument. 578 F.3d at 1211. But the specific fact witnesses of whom SCO complains had no firsthand knowledge of Amendment 2. For example, one witness referenced by SCO in its argument is Robert Frankenberg, chief executive officer and later chairman of the board at Novell. Frankenberg testified regarding his involvement in the APA and the closing documents,

---

[11] Once again, SCO cites no law in support of its argument but appears to be claiming the evidence was improper under Fed. R. Evid. 403 as misleading to the jury.

but was no longer with Novell when the second amendment to the APA was negotiated. It would have been inappropriate to question fact witnesses lacking personal knowledge about the meaning or even the existence of the amendment. *See Zokari v. Gates*, 561 F.3d 1076, 1089 (10th Cir. 2009) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") (quoting Fed. R. Evid. 602). If SCO felt Novell was de-emphasizing the controlling nature of Amendment 2, self-help was a sufficient remedy. SCO was free to (and did throughout the trial) emphasize to the jury that Amendment 2 contained the operative language. There was no abuse of discretion.

3.      Admission of Article Referring to SCO as "The Most Hated Company in Tech"

Over SCO's objection, the district court allowed Novell to show the jury a slide containing a quote from a BusinessWeek article referring to SCO as "The Most Hated Company in Tech." (R. Vol. VIII at 2815; R. Vol. XIV at 5091). The slide was part of the examination of Novell's damages expert who criticized the failure of SCO's damages expert to consider the toll SCO's own actions had taken on its potential market. In particular, SCO's expert did not account for the effect of SCO's "business plan . . . founded on litigation . . . ." (R. Vol. VIII at 2815.) The article was used to highlight SCO's tactic of demanding from Linux users a form of royalty payment under threats of infringement suits and demonstrate how the tactic incurred alienation of SCO in the "open source" market and was a possible cause of the damage to SCO during the period it alleged to have been slandered.

SCO argues the slide was impermissible hearsay. We need not dwell on its technical hearsay arguments because any possible error was harmless.

> Because hearsay determinations are particularly fact and case specific, our review of those decisions is especially deferential. Further, this court applies a harmless error standard when reviewing trial courts' rulings on hearsay objections resting solely on the Federal Rules of Evidence. A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect.

*United States v. Collins*, 575 F.3d 1069, 1073 (10th Cir. 2009) (quotation and citation omitted).

The language of which SCO complains is one line of text briefly before the jury during a three-week trial. In addition, there was repeated testimony and argument over the course of the trial pointing out the unpopularity of the SCO Source program. The admission of this single piece of evidence did not undermine the jury's decision.

B.      Judgment as a Matter of Law (Rule 50)

SCO argues the court erred in denying its Rule 50 motion because the evidence showed ownership of the copyrights was "required for SCO to exercise its rights with respect to the acquisition of UNIX . . . technologies" and the copyrights were therefore transferred under the language of Amendment 2 to the contract.[12] The question of whether the copyrights were required for SCO to exercise its rights depends entirely upon what portion of the UNIX business the APA transferred. SCO contended at trial, and

---

[12] SCO argues at length that the language of Amendment 2 is controlling. It appears SCO maintains the district court and jury ignored the words "required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies" in reaching their results. (Appellant Br. at 26.) However, as we explain below, it is clear the district court and jury interpreted the language of the APA as amended.

- 12 -

continues to argue, it had to have the copyrights to protect the UNIX technologies.

Novell argued, and continues to argue, the copyrights were not transferred to SCO in the

APA and they were not necessary for SCO to exercise its rights in the business because

the "business" SCO purchased was limited to: (1) the right to create its own product

based on UNIX (which it was then free to copyright and protect) and (2) the power to act

as Novell's agent in licensing and marketing (with certain restrictions) established UNIX

technologies.

We review de novo the district court's ruling on a Rule 50 motion for judgment as

a matter of law, drawing all reasonable inferences in favor of the nonmoving party. We

reverse the denial of such a motion only if we conclude "the evidence points but one way

and is susceptible to no reasonable inferences supporting the party opposing the motion."

*Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1243-44 (10th Cir. 2009), *cert.*

*denied*, 130 S. Ct. 2405 (2010). We do not "weigh evidence, judge witness credibility, or

challenge the factual conclusions of the jury."[13] *Id.* at 1244.

In support of its arguments, SCO points to extensive evidence supporting its

interpretation of the APA. However, the question for purposes of the Rule 50 analysis is

not whether SCO presented compelling evidence but whether the "evidence points but

---

[13] In reviewing the district court's grant of summary judgment, we were required to "view the evidence and draw reasonable inferences therefrom in the light most favorable to [SCO]." *Novell I*, 578 F.3d at 1208. Here, we are required to do just the opposite and view all evidence and draw all inferences in the light most favorable to Novell. Insofar as SCO is arguing the APA may only be interpreted one way as a matter of law, we rejected that argument when we reversed summary judgment because there were triable issues of fact and competing conclusions to be drawn from the evidence. *Id.* at 1217. We will not revisit it here.

one way." It does not. The copyrights do not appear on the detailed list of assets to be transferred in the APA and, indeed, the original language in the APA specifically excluded all copyrights from the assets being transferred.[14] Moreover, Novell's Board of Directors adopted a resolution approving the sale, which specifically mentioned the copyrights were to be retained by Novell. According to SCO's witnesses the "all copyrights" language ran contrary to SCO's intent. But such intent is not demonstrated by the plain language of the APA before it was amended. Moreover, the unexpressed intent of one contracting party is irrelevant. Mutual intent governs.

As to Amendment 2, both parties presented evidence about its intent and meaning. SCO's witnesses testified the amendment was to remedy the error resulting in Novell retaining the copyrights in the original transaction. Novell's witnesses testified Amendment 2 was to allay SCO's fears about violating Novell's intellectual property rights in the everyday operation of the transferred portion of the business but was never intended to transfer the copyrights to older versions of UNIX. In fact, the Novell witnesses involved in the negotiation of Amendment 2 testified that SCO's first draft of the Amendment included language explicitly transferring the copyrights, which Novell's negotiators removed[15] because the copyrights had been excluded from the transfer in

---

[14] No document explicitly transfers the UNIX copyrights. The final sale was executed pursuant to the terms of the APA, which contains only the ambiguous language at issue here.

[15] The proposed language, which Novell rejected, excluded from transfer "[a]ll copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of this Amendment No. 2, which pertain to the UNIX and UnixWare technologies and **which SCO has acquired hereunder**." (R. Vol. XIII at 4753)

order to protect Novell's royalty streams in the existing UNIX licenses.

SCO contends uncontroverted evidence shows the UNIX copyrights were "required" for SCO to run the business. This argument assumes the entire business was transferred. Novell presented sufficient evidence at trial showing only two things were sold in the transaction—(1) the UNIX licensing business, which SCO would continue on behalf of Novell in exchange for 5% of total royalties while Novell retained the copyrights and 95% of the royalty stream and (2) UnixWare and the license to use the underlying UNIX source code. Novell admits copyright ownership would be required to protect existing UNIX licenses. However, it presented testimony and documentary evidence showing SCO was merely to act as Novell's agent in managing the existing licenses and collecting royalties while Novell retained ownership and ultimate control of that aspect of the UNIX business. The APA itself expressly gives Novell the right to direct SCO's behavior regarding such licenses. SCO also argues the copyrights were required to protect the UNIX source code. However, as Novell showed at trial, SCO was able to protect the products it developed by copyrighting additions to the existing code and the copyrights to earlier versions were not required for SCO to carry out its responsibilities under the APA as Novell's licensing agent.

There was ample evidence to support Novell's contention that the copyrights were not transferred in the sale and not necessary to the operation of the business transferred. The district court properly denied SCO's motion for judgment as a matter of law under

---

(emphasis added).

Fed. R. Civ. P. 50(b).

## IV.  MOTION FOR NEW TRIAL

We review the district court's denial of the motion for a new trial for an abuse of discretion.  *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1216 (10th Cir. 2008).  "The inquiry focuses on whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence."  *Black v. Hieb's Enter., Inc.,* 805 F.2d 360, 363 (10th Cir. 1986).  SCO devotes one paragraph of its brief to this issue.  For previously discussed reasons, the denial of SCO's request for a new trial was not an abuse of discretion.  Ample evidence in the record supported the jury's verdict and Novell's position.

## V.   SPECIFIC PERFORMANCE

SCO sought to compel Novell to transfer ownership of the copyrights to it.  Specific performance is an exercise of the equitable discretion of the district court and we review the court's decision for an abuse of discretion.  *Koch v. Koch*, 903 F.2d 1333, 1335-36 (10th Cir. 1990).

The jury rejected SCO's argument that Amendment 2 transferred the Unix and UnixWare copyrights because they were required for SCO to exercise its rights in the newly acquired technologies.  Because the jury determined SCO had no claim to the copyrights, the court did not abuse its discretion in denying SCO's request for specific performance.

## VI.   NOVELL'S ABILITY TO WAIVE SCO'S RIGHTS UNDER EARLY UNIX LICENSING AGREEMENTS

We determined the APA was ambiguous regarding the scope of Novell's waiver

- 16 -

rights and remanded to the district court for trial on the issue. *Novell I*, 578 F.3d at 1224.

"Once a provision is found to be ambiguous, the resolution of its proper meaning is a question of fact, subject to review on a clearly erroneous standard." *Nunn v. Chem. Waste Mgmt., Inc.*, 856 F.2d 1464, 1467 (10th Cir. 1988) (citations and quotations omitted). At the start of the trial the parties agreed to submit the issue for decision by the judge rather than the jury.

The APA gives Novell the ability to waive any claim of right SCO might make with regard to "SVRX Licenses."[16] (R. Vol. IX at 3134.) The dispute was centered on the particular agreements to be included in that term. As testimony showed at trial, there are three parts to the UNIX licensing scheme. UNIX customers must sign a software licensing agreement setting forth the terms on which they are permitted to use and/or modify licensed products. This umbrella agreement contains general terms governing the use of licensed intellectual property but does not specify what products are being licensed. Customers developing software for resale using UNIX source code must also sign a software sublicensing agreement, which governs such use. Finally, all customers must enter into a product supplement, which lists each licensed product and specific information (including royalties due) related to each.

SCO argues the APA waiver language does not allow Novell to interfere with its ability to terminate IBM's software licensing agreement because the waiver language was only intended to apply to the product supplement; the other agreements are not "SVRX

---

[16] As stated above, SVRX refers to the versions of Unix transferred from AT&T to Novell prior to the development of UnixWare.

licenses" under the APA.  SCO points out that the language dictating Novell's SVRX

royalties is contained only in the product supplement.  The software licensing and

sublicensing agreements do not explicitly refer to the licensed SVRX version.  SCO

contends Novell exceeded the scope of its rights under the APA by directing SCO to

waive (and later by waiving) its rights under IBM's general software licensing

agreements.

However, the APA's language is not so restrictive.  As the district court noted, the

contract language does not distinguish between the three types of agreements.  The

district court reasoned:

> Novell retained a significant financial interest  . . . [which] Section 4.16 of
> the APA was designed to protect . . . . The somewhat hierarchical structure
> of the three types of agreements leads to the conclusion that Novell must
> retain rights over the software and sublicensing agreements as well . . . .  If
> Novell did not have the authority over the software agreements, SCO could
> easily cancel that agreement, necessarily cancelling both the sublicensing
> and product supplement agreements, and thereby deprive Novell of all
> revenue.

(*Id*.) [17]  It was not clear error for the district court to determine "SVRX licenses" referred

to all of the integrated licensing agreements.[18]

---

[17] SCO argues the district court's reasoning is impermissible under language in *Novell I*.  Our opinion there focused on problems with Novell's interpretation of the waiver provision in the context of summary judgment because we disagreed with the district court's conclusion no rational trier of fact could accept SCO's interpretation.  However, we ultimately concluded only that "the [waiver] language . . . [was not] so clear as to preclude SCO's interpretation of the scope of Novell's waiver rights."  *Novell I*, 578 F.3d at 1224.  *Novell I* did not bar the district court from accepting Novell's interpretation as correct after weighing all the evidence.

[18] A witness who specialized in dealing with the contracts testified they were integrated agreements that worked together.  The district court specifically noted that testimony.

## VII. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

SCO argues the district court erred in entering judgment in Novell's favor on its good faith and fair dealing claim (Novell breached the implied covenant by waiving SCO's rights under the licensing agreements). Interpretation of a contract, including the implied covenant of good faith and fair dealing, is a question of law, which we review de novo. *See Flood v. Clearone Commc'n, Inc.*, 618 F.3d 1110, 1117-18 (10th Cir. 2010); *Del Taco, Inc. v. Univ. Real Estate P'ship V*, 3 Cal. Rptr. 3d 311, 315 (Cal. Ct. App. 2003). As noted in our previous opinion, under California law, the covenant of good faith and fair dealing does not apply to an express grant of authority like the one at issue here unless: 1) the covenant would aid in the interpretation of a contradictory and ambiguous contract, or 2) the granted authority would render an agreement unenforceable and illusory. *Novell I*, 578 F.3d at 1227.

SCO argues the contract is either contradictory or illusory without the good faith restriction because giving Novell unconstrained rights to control the licenses would leave SCO helpless to protect the underlying source code. However, the jury found SCO did not own the copyrights to the earlier versions of the UNIX code. The district court found the parties intended for SCO to serve as Novell's agent with respect to the old SVRX licenses and the only portion of the UNIX business transferred outright under the APA was the ability to exploit and further develop the newer UnixWare system. SCO was able to protect that business because it was able to copyright its own improvements to the system. The only reason to protect the earlier UNIX code would be to protect the existing SVRX licenses, and the court concluded Novell retained ultimate control over

- 19 -

that portion of the business under the APA.  The district court's conclusion on this point is consistent with the jury verdict on copyright ownership and is supported by evidence in the record.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge